## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

In Re:

RICHARD A. WESTERFIELD

      Debtor.

_____/

MORGAN & MORGAN, P.A.,
a Florida professional association,

      Plaintiff,

v.

RICHARD A. WESTERFIELD,

      Defendant.

_____/

Case No. 15-26746-BKC-JKO
Chapter 7

Adv. Proc. No.:_____

## COMPLAINT OBJECTING TO
## DISCHARGEABILITY OF DEBT AND TO DEBTOR'S DISCHARGE

Plaintiff, Morgan & Morgan, P.A. (the "Plaintiff"), hereby sues Richard A. Westerfield (the "Debtor"), and alleges:

### A.     Parties, Jurisdiction and Venue

1.     On September 18, 2015 (the "Petition Date"), the Debtor filed his voluntary Chapter 7 petition for protection from creditors (the "Petition") pursuant to Bankruptcy Code § 301 and other applicable law. The Petition was filed in the United States Bankruptcy Court for the Southern District of Florida, Fort Lauderdale Division, and thereby initiated the bankruptcy case styled, In re Richard A. Westerfield, Case No.: 15-26746-BKC-JKA (the "Bankruptcy Case").

2.     The Debtor is an individual doing business in the Southern District of Florida.

3.     The Plaintiff is a Florida professional corporation doing business in the Southern

District of Florida and is a creditor of the Debtor in the Bankruptcy Case.

4. This Court possesses "core" jurisdiction over this adversary proceeding pursuant to 28 U.S.C § 157(b)(2)(I) and 28 U.S.C. § 1334, and related law.

5. Venue properly lies before this Court pursuant to 28 U.S.C. § 1409 and other applicable law.

**B. Background Allegations**

6. This adversary complaint (this "Complaint") relates to the misappropriation of payments made by the Plaintiff to the Debtor in furtherance of taxi cab related marketing activities in multiple cities where the Plaintiff operates (collectively, the "Taxi Cab Marketing Payments"). This Complaint stems from the Debtor's conversion of the Taxi Cab Marketing Payments (the "Conversion Activities"), the Debtor's false statements to the Plaintiff made regarding his Conversion Activities (the "False Statements"), and the Debtor's unauthorized transfers (the "Fraudulent Transfers") of the proceeds of the Taxi Cab Marketing Payments to related corporations Flow Adv, LLC, a Florida limited liability company ("Flow"), and 208 Westchester, LLC, a Florida limited liability company ("Westchester"), that the Debtor owns and controls.

7. The Plaintiff is one of the largest law firms based in the State of Florida. Moreover, the Plaintiff is the largest law firm of its kind in the United States, geared to the representation of individuals in medical malpractice, personal injury, wrongful death, mass tort, and consumer protection litigation. In furtherance of its business operations, the Plaintiff markets its full range of services prominently in the main stream media. The Plaintiff also utilizes advertising space on taxi cabs, commonly known as "taxi tops," to enhance its visibility.

8. The Plaintiff has worked directly with the Debtor in connection with the placing of advertising on taxi tops on a vehicle-by-vehicle basis, taxi cab vehicles commonly referred to as

2

"Units" in this aspect of the advertising industry. The Debtor's sole proprietor marketing brokerage business is commonly referred to as "Flow Group"; however, in point of fact, the Debtor has not incorporated "Flow Group." All business conducted with the Plaintiff has been conducted by the Debtor individually, as an individual working out of his residence.

9.      In connection with the Debtor's taxi top marketing activities, the Debtor handles a certain amount of logistical work and supports himself. However, the Debtor also interfaces with vendors such as 7 Sun Media, LLC, Mobile Taxi Media, LLC, Vector Media, LLC, and Verifone Media, LLC (collectively, the "Vendors"), to arrange with taxi cab businesses (the "Cab Companies") for the installation of taxi tops for set numbers of Units over a given term. There is understood to be some profit involved in the Debtor's brokerage-type activities associated with the installation of Units.

10.      Regular and accurate reporting as to the placing of Units with Cab Companies has always been expected of the Debtor from the Plaintiff. The Plaintiff relies upon the Debtor, the Vendors, and the Cab Companies to make sure that the Plaintiff's visibility remains constant. This is an integral part of the Plaintiff's business marketing plan. This is unlike the business of a corporate law firm, for example, where one or two large clients can sustain the law practice. The visibility of the Debtor, and its efforts to widely promote its full range of specialized services, plays a unique role that the Debtor surely has always understood and recognized.

11.      The Plaintiff assigns certain marketing tasks to its Art Director, Tricia Barr. During May 2015, Ms. Barr noticed that there was a material discrepancy between Taxi Cab Marketing Payments made and the number of Units outfitted with taxi tops advertising the Plaintiff in relevant communities. Her present findings are summarized as follows:

3

a. For the Vendor known as 7 Sun Media, during the covered period at issue, the Plaintiff paid the Debtor $56,000 for 700 Units in the Orlando Metro Area, for which the Debtor actually placed 235 Units, leaving a shortfall of 465 Units, amounting to a discrepancy of $37,200.

b. Also for 7 Sun Media, during the covered period at issue, the Plaintiff paid the Debtor $50,000 for 630 Units in the Memphis Metro Area, for which the Debtor actually placed 306 Units, leaving a shortfall of 297 Units, amounting to a discrepancy of $25,920.

c. For the Vendor known as Vector, during the covered period at issue, the Plaintiff paid the Debtor $101,250 for 1,350 Units in the Jacksonville Metro Area, for which the Debtor actually placed no Units at all, amounting to a discrepancy equivalent to the entire payment.

d. During April 2015, the Plaintiff advanced $88,000 to the Debtor for future Units in the Orlando Metro Area, and the Debtor has purchased no Units at all, amounting to a discrepancy equivalent to the entire payment.

e. The Plaintiff utilized the Debtor's services directly in connection with Jacksonville production costs, for taxi tops for 150 Units, at a cost of $3,000; however, there was no production, no Units were fitted with taxi tops, and a $3,000 discrepancy therefore exists.

In light of all of the foregoing, an aggregate discrepancy of $255,370 (the "Converted Funds") existed between Taxi Cab Marketing Payments and Units actually fitted and related services actually covered. The Debtor's conduct regarding misappropriation of the Converted Funds to his own use over a period of time is being defined in paragraph 11 above as the Conversion Activities.

4

12.     Ms. Barr initially confronted the Debtor about the perceived discrepancy based upon a day that she spent in Jacksonville observing taxi cab traffic.  However, the Debtor's initial response was to provide misinformation as to Units advertising in Jacksonville, Memphis, and Orlando.  The Plaintiff at first relied upon the Debtor's denial that there was a discrepancy. This led to the above-referenced $88,000 prepayment during April 2015.  The Debtor's false statements regarding the earlier Conversion Activities advanced the successive Conversion Activities that the Debtor perpetrated against the Plaintiff.  Had the Debtor been forthright at any point in the process, the amount of Converted Funds would have been smaller.  Moreover, the business impact of the Plaintiff being deprived of required advertising would have been lessened.

13.     Ultimately Ms. Barr conducted empirical analysis and required follow-up to confirm that Units were not placed with the relevant Vendors, and Cab Companies therefore did not install a large number of Units.  When confronted directly with the Debtor's apparent theft of the Taxi Cab Marketing Payments, the Debtor ultimately admitted that the discrepancy results from the Debtor's fraudulent misappropriation of the Converted Funds.  The Debtor attributed his decision-making to health and financial problems, an explanation but not an excuse.

14.     After being caught, and in a sign of good faith, the Debtor made a payment to the Plaintiff of $20,000.  For purposes of this Complaint, it is appropriate to reduce the amount of the Converted Funds by this $20,000 payment, making the base amount of the readily calculated damages to be $235,370, without inclusion of treble damages under Florida Statutes § 772.11, as applicable and described below.  However, the business damages caused by lack of advertising on the required Units is not captured by simply focusing on the conversion itself.

15.     Following the Debtor's initial admission to Ms. Barr, the Debtor has explained that he invested the Converted Funds in the Transferees.  Specifically, the Debtor purchased a condominium

5

(the "Condominium") in the name of one of the Transferees. The Debtor has apparently refurbished the Condominium for purposes of "flipping" it, making the Plaintiff an unwitting investor in the Condominium. The Condominium is identified as Unit 208, 3080 NE 47th Court, Ft. Lauderdale, FL 33309. Information regarding the status of construction completion, marketing plans, and related efforts on the Debtor's part, makes clear that every act of investing the Plaintiff's money in the Condominium is a fraudulent transfer, and all are defined as the Fraudulent Transfers.

16. The Plaintiff asserts an equitable lien on the Condominium, senior and superior to any interests that the Debtor of the Transferees may hold as actual owners of record or otherwise. The Plaintiff also claims an equitable lien in all proceeds of the Debtor Wells Fargo business account, number 5485386329 (the "Concentration Account"), where the Converted Funds have been concentrated.

17. On June 4, 2015, the Plaintiff served the Debtor and Transferees with a demand pursuant to Florida Statutes § 772.11, as a result of the Conversion Activities, in the amount of $706,110 (the "Theft Amount"). A copy of the Civil Theft Demand is attached hereto as Exhibit "A."

18. On June 8, 2015, the Plaintiff initiated a state court action (the "State Court Action") against the Debtor. Flow, and Westchester, by filing a complaint (the "State Court Complaint").

19. Due to the failure to comply with the Civil Theft Demand, on July 14, 2015, prior to the Petition Date, the Plaintiff filed its amended complaint (the "Amended State Court Complaint"), a copy of which is attached hereto as Exhibit "B."

20. The Amended State Court Complaint contains the following counts:

    a. Count I: Damages for Conversion

    b. Count II: Damages for Actual Fraud

    c.     Count III: Recovery of Fraudulent Transfers

    d.     Count IV: Declaratory Judgment

    e.     Count V: Quantum Meruit

    f.     Count VI: Civil Theft

**Count I:  Objection to Dischargeability of a Debt Pursuant to Section 523(a)(2)(A)**

21.    This is an action to determine the dischargability of the amounts owing by the Debtor to the Plaintiff, that being the Theft Amount pursuant to Bankruptcy Code § 523(a)(2)(A).

22.    The Plaintiff realleges and incorporates the allegations in paragraphs 1 through 20 as though fully set forth herein.

23.    The Debtor, individually and as the principal of the Flow and Westchester, committed actual fraud against the Plaintiff, by misappropriating the Converted Funds for his own use, without obtaining the appropriate Units as described herein, intentionally and maliciously deceiving the Plaintiff, and transferring the Converted Funds to the Transferees for the purchase of the Condominium and other personal uses, rather than payment of Vendors or obtaining of marketing materials as contracted for by the Plaintiff.

24.    The Plaintiff justifiably relied on the fraudulent misrepresentations of the Debtor, and has suffered actual damages as a result of the Debtor's fraud.

25.    Pursuant to Bankruptcy Code § 523(a)(2)(A), the foregoing indicates that the Plaintiff's claim referenced above is non-dischargeable based upon the fact that it has arisen as a result of the Debtor's false pretenses, false representations, and actual fraud.

WHEREFORE, the Plaintiff respectfully requests that this Court:

    a.     determine that the Theft Amount is non-dischargeable as against the Debtor;

7

b.      enter a judgment in favor of the Plaintiff and against the Debtor for the amount of the Theft Amount, and any other damages incurred subsequent to the rendition of the judgment that relates to the claim of the Plaintiff; and

c.      grant to the Plaintiff any other relief measurable as permitted, including those memorializing the Plaintiff's liens encumbering the Condominium and Concentration Account, and applicable bankruptcy and non-bankruptcy law.

**Count II:  Objection to Dischargeability of a Debt Pursuant to Section 523(a)(4)**

26.    This is an action to determine the dischargability of the amounts owing by the Debtor to the Plaintiff, that being the Theft Amount pursuant to Bankruptcy Code § 523(a)(4).

27.    The Plaintiff realleges and incorporates the allegations in paragraphs 1 through 20 as though fully set forth herein.

28.    The Debtor, individually and as the principal of Flow and Westchester, embezzled funds from the Plaintiff by misappropriating the Converted Funds for his own use, intentionally and maliciously deceiving the Plaintiff, without obtaining the appropriate Units as described herein, and transferring the Converted Funds to the Transferees for the purchase of the Condominium and other personal uses, rather than payment of Vendors or obtaining of marketing materials as contracted for by the Plaintiff.

29.    Pursuant to Bankruptcy Code § 523(a)(4), the foregoing indicates that the Plaintiff's claim referenced above is non-dischargeable based upon the fact that it has arisen as a result of the Debtor's embezzlement and larceny.

WHEREFORE, the Plaintiff respectfully requests that this Court:

a.      determine that the Theft Amount is non-dischargeable as against the Debtor;

8

b.  enter a judgment in favor of the Plaintiff and against the Debtor for the amount of the Converted Funds, and any other damages incurred subsequent to the rendition of the judgment that relates to the claim of the Plaintiff; and

c.  grant to the Plaintiff any other relief measurable as permitted, including those memorializing the Plaintiff's liens encumbering the Condominium and Concentration Account, and applicable bankruptcy and non-bankruptcy law.

**Count III: Objection to Dischargeability of a Debt Pursuant to Section 523(a)(6)**

30.  This is an action to determine the dischargability of the amounts owing by the Debtor to the Plaintiff, that being the Theft Amount pursuant to Section 523(a)(6).

31.  The Plaintiff realleges and incorporates the allegations in paragraphs 1 through 20 as though fully set forth herein.

32.  The Debtor, individually and as the principal of Flow and Westchester, committed willful and malicious injury to the Plaintiff by misappropriating the Converted Funds for his own use, intentionally and maliciously deceiving the Plaintiff, without obtaining the appropriate Units as described herein, and transferring the Converted Funds to the Transferees for the purchase of the Condominium and other personal uses, rather than payment of Vendors or obtaining of marketing materials as contracted for by the Plaintiff. This injury not only includes the monetary value of the Converted Funds, but also the business damages suffered as a result of the Debtor's willful failure to obtain the appropriate marketing materials contracted for by the Plaintiff, particularly where the Plaintiff relied on the misrepresentations of the Debtor.

33.  Pursuant to Bankruptcy Code § 523(a)(6), the foregoing indicates that the Plaintiff's claim referenced above is non-dischargeable based upon the fact that it has arisen as a result of the Debtor's willful and malicious injury to the Plaintiff.

WHEREFORE, the Plaintiff respectfully requests that this Court:

a. determine that the Theft Amount is non-dischargeable as against the Debtor;

b. enter a judgment in favor of the Plaintiff and against the Debtor for the Theft Amount, and any other damages incurred subsequent to the rendition of the judgment that relates to the claim of the Plaintiff; and

c. grant to the Plaintiff any other relief measurable as permitted, including those memorializing the Plaintiff's liens encumbering the Condominium and Concentration Account, and applicable bankruptcy and non-bankruptcy law.

## Count IV: Objection to General Discharge Pursuant to Section 727(a)(2)(A)

34. This is an action to determine the that the Debtor is not entitled to a discharge pursuant to Bankruptcy Code § 727(a)(2)(A).

35. The Plaintiff realleges and incorporates the allegations in paragraphs 1 through 20 as though fully set forth herein.

36. The Debtor, individually and as the principal of Flow and Westchester, transferred and concealed the Converted Funds with an intent to hinder, delay, and defraud the Plaintiff within one (1) year before the Petition Date.

37. Pursuant to Bankruptcy Code § 727(a)(2)(A) the foregoing indicates that the Debtor is not entitled to a discharge.

WHEREFORE, the Plaintiff respectfully requests that this Court:

a. find that the Debtor concealed the Converted Funds with the intent to delay, hinder, and defraud the Plaintiff within one (1) year from the Petition Date;

b. find that the Debtor is not entitled to a discharge; and

c. all other appropriate relief.

10

WHEREFORE, the Plaintiff demands judgment that the Debtor is not entitled to a discharge pursuant to Bankruptcy Code § 727, and for such other relief as is necessary and appropriate.

DATED: October 9, 2015

/s/ John A. Anthony
**JOHN A. ANTHONY, ESQUIRE**
Florida Bar Number:  0731013
janthony@anthonydpartners.com
**ALLISON C. DOUCETTE, ESQUIRE**
Florida Bar Number: 0085577
adoucette@anthonyandpartners.com
ANTHONY & PARTNERS, LLC
201 N. Franklin Street, Suite 2800
Tampa, Florida  33602
Telephone:  813/273-5616
Facsimile:  813/221-4113
Attorneys for the Plaintiff

11